## MORRIS & CO. v. H. L. HANDY & CO.

(Circuit Court of Appeals, First Circuit. January 6, 1925.)

### No. 1797.

1. **Brokers ⊗⟑94—Broker without authority to make contract for buyer after informing him his offer was refused.**

Where broker wired its agent, who had obtained a bid for five carloads of hams, that he did not think he could buy them at price offered, and the agent told the offerer that he could not get the cars, any error of agent in construing broker's telegram was the broker's error, the offerer had a right to assume that the negotiations were at an end, and the broker had no authority to buy hams on behalf of the offerer.

2. **Brokers ⊗⟑100—One dealing with broker did so at its peril, in absence of ostensible authority.**

One accepting order for hams from a broker did so at its peril as to broker's actual authority to bind the buyer, where there was no reliance on ostensible authority; it knowing nothing of the relation between the broker and the buyer.

3. **Brokers ⊗⟑103—Burden to show ratification was with knowledge of facts.**

One relying on corporation manager's ratification of broker's unauthorized contract had the burden of showing, not only acts of ratification, but that they were done with full knowledge of all material facts.

4. **Brokers ⊗⟑103—Question whether contract was made held for jury.**

Under evidence of a custom of the trade for the seller to send direct to the buyer a confirmation of a sale made through brokers, and for the buyer promptly to sign and return it, where, though no contract binding on the buyer had been made by the brokers, the seller in ignorance of that fact sent a confirmation to the buyer, which was not returned or replied to, whether the contract was thereby ratified by the buyer *held* a question for the jury.

5. **Sales ⊗⟑53(1)—Question of ratification of contract held for jury.**

The question whether failure to disaffirm a ratification of a contract of sale by the buyer, which, because made under a misapprehension of the facts, was not binding, but which was subsequently acted on by the seller, amounted to a binding ratification, *held* for the jury.

In Error to the District Court of the United States for the District of Massachusetts; Elisha H. Brewster, Judge.

Action at law by Morris & Co. against H. L. Handy & Co. Judgment for defendant, and plaintiff brings error. Reversed and remanded.

Edward A. McLaughlin, Jr., of Boston, Mass., for plaintiff in error.

Charles F. Choate, 3d, of Boston, Mass. (Marcien Jenckes, of Cambridge, Mass., on the brief), for defendant in error.

3 F.(2d)—7

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. The main question in this case is whether the court below was right in ordering a verdict for the defendant, on the ground that there was no evidence warranting the jury in finding a contract.

The suit was brought to recover damages for breach of an alleged contract for the sale of five carloads of hams by the plaintiff to the defendant in June, 1922. The breach declared upon is a refusal (admitted) to accept and pay for four of the five carloads. The facts of controlling importance are rather unusually complicated, by reason of the intervention of an unusual number of middlemen. But the task of analysis has been simplified by able briefs and arguments on both sides.

The plaintiff is a packing house with headquarters in Chicago. The defendant is a dealer in packing house products in Springfield, Mass. Its chief executive is H. L. Handy, Sr., who had been in the business for 38 years. His son, H. L. Handy, Jr., had been associated with him for about 12 years, and had the title of manager.

On Monday morning, June 26, 1922, Bartlett, manager in New Haven, Conn., of Winchell, a dealer or broker in food products, in Cortland, N. Y., called on Handy, Sr., in accordance with his regular practice, and obtained a bid for five carloads of hams, 18 to 20 pounds, average weight, at 26½ cents. Bartlett wired Winchell in Cortland at 1:25 p. m. as follows:

"Handy offers 26½ cents for five cars 18 to 20 green skinned hams. Shipment one car every three days. Might buy 18 to 22. * * *"

On the same day, Bartlett received from Winchell a telegram as follows:

"Referring to Handy's offer, don't think can buy 18 to 20 green skinned hams at 26½ cents but might buy if you make average 18 to 22. Can I do this if necessary?"

About noon on June 27, Bartlett told Handy, Sr., that he could not get the five cars at 26½ cents, and offered him another assortment at higher prices. Bartlett and Handy, Sr., both regarded and treated defendant's original offer of 26½ cents for 18/20 hams as dead. Handy, Sr., told Bartlett to call him on the 'phone at 2 o'clock and he would give him a definite answer; at 2 o'clock Handy, Sr., told Bartlett that he had covered his requirements, but would take at 27 cents one car—shipment on July 10.

But Winchell, not treating his telegram of June 26 to Bartlett as a refusal of Handy's original offer, had, after telegraphing various concerns, sent on the night of June 27 to Cross, Roy & Saunders, pork product brokers in Chicago (hereafter called Cross), a telegram to book Handy 150,000 pounds green skinned hams 18 to 20, 26½ cents. Cross, on June 28, ordered the hams from the plaintiff by 'phone, and on the same day so telegraphed Winchell. To this telegram Winchell on June 28 at 1:50 p. m. wired, "Message received satisfactory Handy as per your wire."

When Winchell received this telegram of June 28 from Cross, he had heard nothing further from Bartlett except a telegram dated June 27, transmitting Handy's bid of 27 cents on one carload, pursuant to the arrangement made between Bartlett and Handy, Sr., at 2 o'clock on June 27. He had left his statement that he did not think he could buy at 26½ cents standing unmodified.

On June 28, Winchell, as a result of his dealings with Cross, wired Bartlett:

"Decline Handy cornbelt car 18 to 20 green skinned hams. Sold Handy 150,000 pounds 18 to 20 green skinned hams 26½ cents cost and freight 30,000 pounds shipment June 30, July 3, 6, 10, 13, or within forty-eight hours of dates specified and ship on dates specified if possible. We worked hard on this."

"Cornbelt car" refers to defendant's offer to take one car at 27 cents.

Bartlett receiving this telegram on June 28, telephoned Handy, Sr., in the evening at Handy's home, and told him that they had bought him five carloads of hams and asked if he could use them. Handy, Sr., replied that he had already filled his requirements and did not want the hams, but to call him up at 8:30 the next morning at his office and that he would then see what he could do. On that evening, Barlett wired defendant a night letter, saying:

"Confirming telephone conversation have bought you five cars 18 to 20 green skinned hams 26½. Shipment June 30, July 3, 10, 13, 16 or within forty-eight hours of these dates. Mr. Winchell wires worked hard to get these for you. * * *"

Bartlett testifies that this telegram was intended by him as a mere memorandum, and not as a confirmation of a sale. Handy, Sr., was not at his office the next morning, having left for New York on a very early train because of an unexpected call. Bartlett called up and talked with Handy, Jr. Bartlett did not tell Handy, Jr., of the "mix-up"

over his talk the evening before with Handy Sr. Handy, Jr., had not talked with his father; but he had found Bartlett's night letter "confirming telephone conversation," etc., as to the purchase of the five cars at 26½ cents and also a confirmation of a sale of five carloads from a Boston concern with which his father had placed an order on June 27 after Bartlett had notified him that Winchell could not meet Handy's original offer. After futile attempts by Handy, Jr., to telephone his father in New York, he told Bartlett that if they would delay shipment a week the defendant would take the hams. Bartlett thereupon, at 8:46 a. m., June 29, wired Winchell that Handy would use the hams if shipment were delayed one week. Winchell transmitted this message through Cross to the plaintiff, and the change as to shipping date was accordingly made.

But after his return from New York, Handy, Sr., having learned what happened, called Bartlett up on June 30, and told him that he could not and would not use the five carloads of hams. Bartlett forthwith called Winchell and told him of Handy's position. But Winchell did not notify Cross or the plaintiff of what Bartlett had told him. Instead, he tried to keep the matter open and dispose of the hams in some other way. Meantime, one carload, shipped on July 1, was accepted, and later paid for by the defendant.

There is some discrepancy in the rather extended evidence concerning this carload and the "cornbelt car." We omit details; simply noting that we do not, under the circumstances disclosed, regard defendant's acceptance of this car as evidence of ratification of the alleged contract for five cars, and that plaintiff credits this car to the contract, thus claiming a breach as to only four cars.

The plaintiff's assistant manager of the provision department testified that it took the order on June 28 by telephone from Cross for an unknown customer of Cross's; that on receiving the name of the purchaser it sent on June 28 to the defendant, by mail, a confirmation in the usual form; that this confirmation was never received back from the defendant; that also on the same day a confirmation was received by the plaintiff from Cross; that on June 29 the plaintiff was informed that the shipments were to be delayed a week, to which the plaintiff agreed; that on July 8 plaintiff wrote the defendant to the effect that under date of June 28 it had sent defendant a sale confirmation; and that as it had not received the original, duly signed, it asked to have it by return mail.

Under date of July 10 the defendant telegraphed plaintiff:

"Answering letter, have no hams coming from you. Bought one car same has been delivered."

This reference was to the car shipped on July 1 and accepted as above noted. On the same date (July 10) plaintiff telegraphed defendant to the effect that it had sold and confirmed to defendant five cars of hams on June 28, and that if confirmation mailed was not in accordance with purchase through broker, defendant should have advised plaintiff immediately by wire or letter; that therefore plaintiff must insist on defendant's accepting sale in accordance with terms of sale, and that the second car was going forward that day.

Plaintiff received no answer to this telegram and telegraphed again on July 12 to the effect that it had received and was shipping the third car on July 12, and fourth and fifth cars, according to its confirmation. This also was not answered. On the same day, July 12, a letter was written by plaintiff to defendant:

"We shipped you yesterday from Omaha car MRL—10735 containing green skinned hams sold through Cross, Roy and Saunders."

No reply was received to this and the next the plaintiff learned was from a telegram from their branch manager at Springfield,— that the defendant had refused to take the second car. Defendant relied on Bartlett and Winchell to fix the matter up and ignored plaintiff.

[1] We turn to the legal results:

Of course the burden is upon the plaintiff to show that it contracted with the defendant through an agent, duly authorized; or, that in some way any unauthorized act was ratified by the defendant. We agree with defendant's counsel that Bartlett and Winchell had, on June 26, only strictly limited powers as defendant's agents to buy the described hams at 26½ cents; that when Winchell telegraphed that he thought he could not get them at that price and Bartlett (naturally enough) interpreted this as a refusal of that offer—and at noon on June 27 so stated to Handy, Sr., and tendered him another assortment at higher prices— Handy's offer was dead. Bartlett was Winchell's general agent in this regard; if Bartlett was wrong in construing Winchell's telegram this became Winchell's error. Handy assumed and had a right to assume, at noon on June 27, that he had no outstanding negotiations with or through Bartlett and Winchell for the five cars; and he filled his requirements elsewhere. Moreover, under the custom shown in the trade, concerning which evidence was properly admitted, an offer to buy or sell, not otherwise limited by its own terms, expires at the opening of the market the next day, apparently at 9:30 a. m. Under this custom, Handy's offer of June 26 was dead before—on June 27, at about noon—Bartlett in effect rejected it.

[2] But the trouble grew out of Winchell's unauthorized telegram, sent to Cross to buy these hams at 10 p. m. on June 27, eight hours after Handy, Sr., had told Bartlett that he had filled his requirements elsewhere. Cross telephoned this order on June 28 to the plaintiff, not then disclosing the name of the purchaser. But the confirmation from Cross dated June 28 showed plaintiff that defendant was the customer; and the sale was then booked and a confirmation sent through the mail by plaintiff to defendant in the usual course of business. But, as Cross had, through Winchell, no real authority to bind the defendant, there was no contract. Plaintiff did not rely on any ostensible authority; it knew nothing of the relation of the parties except that Cross, a broker, said he had an order from Handy for these hams. There was no holding out by defendant to plaintiff of Winchell or Cross as defendant's agent. Plaintiff booked the order at its peril as to actual authority in Cross to bind the defendant; but plaintiff acted in good faith and in the usual course of that line of business.

The situation on the evening of June 28, then, was that plaintiff and defendant, without fault on the part of either, had been put by the erring broker into the false position of apparent seller and purchaser of about $40,000 worth of hams on a market that shortly dropped.

Was there evidence for the jury of a ratification? Bartlett took up the situation over the telephone with Handy, Sr., on the evening of June 28, at Handy's home. Handy said he did not want the hams, and told Bartlett (who for legal purposes was Winchell) to call him the next morning at his office after he had looked over his stock. This was a tentative arrangement to consider ratification. But when, the next morning, Bartlett called up (as stated above), he found and talked with Handy, Jr., who had before him Bartlett's night letter, sent by Bartlett after his talk with Handy, Sr., and beginning, "Confirming telephone conversation have bought you five cars," etc. This unexplained document left Handy, Jr., with but little option; he arranged for a week's delay, and agreed to take the hams.

But, on this record, we think the jury would not have been warranted in finding that the defendant corporation thus ratified the acts of the intervening brokers.

[3] We agree with plaintiff's counsel that there was evidence for the jury of sufficient authority on the part of Handy, Jr. He had the title of manager; he had charge of the plant in his father's absence; indeed, his father seems to have assumed that his son had authority to act in the matter. But we agree with defendant's counsel that the record shows that the acts of Handy, Jr., were without the requisite knowledge of the material facts. The burden was upon the plaintiff to show, not only acts of ratification by a duly authorized agent of the defendant, but acts with full knowledge of all material facts.

The plaintiff's case is fatally defective in that regard. Bennecke v. Insurance Co., 105 U. S. 355, 26 L. Ed. 990; Combs v. Scott, 12 Allen (Mass.) 493, 496, 497. There was, then, on this record, as matter of law, no ratification on June 29 by Handy, Jr.

[4] But on June 30, Handy, Sr., who was back at his office, took up the situation with his son and with Bartlett, finding fault with Bartlett for sending the night letter containing the language "confirming the telephone conversation," etc., supra. He also received from the plaintiff the formal confirmation mailed him by the plaintiff on June 28; but he did not return this confirmation, accepted or rejected, nor did he take any action, except by complaining to Bartlett, to repudiate the ratification made, in form, by his son on June 29.

Considering first the matter of the confirmation: There is uncontradicted evidence that it is a custom of the trade for the buyer to return such confirmation direct to the seller. True, the evidence on that point is not as clear and explicit as might be desired. But, as we understand it, there was enough to indicate that the interchange of such confirmations is an understood part of the trading machinery with which this kind of business is carried on. The business is one in which prices fluctuate substantially and rather rapidly; it is largely carried on through brokers, naturally zealous to earn commissions, and therefore prone to put a broad construction upon any authority given them. The interchange of confirmations is apparently a device intended to prevent just such "mix-ups" as occurred in this case. Clearly, if there be such custom, it is a wise and trouble-saving device. It follows that if, under the custom of the trade, it was defendant's duty to return this confirmation, accepted or rejected, its failure so to do might be held a ratification,—like silence when there is a duty to speak. Foster v. Rockwell, 104 Mass. 167; Union Gold-Mining Co. v. Rocky Mountain Nat. Bank, 96 U. S. 640, 644, 645, 24 L. Ed. 648; 2 C. J. 505, and cases cited.

We think that this issue should have been submitted to the jury under carefully guarded instructions as to the existence and scope of such custom.

[5] Apart from this confirmation from the plaintiff and the custom relating thereto, the defendant's officers (that is, Handy, Sr., and Handy, Jr.) both knew on June 30, after the elder's return from New York, that Handy, Jr., had, in form, ratified the purchase. They knew, or were bound to know, that Bartlett had conveyed information of this ratification, through Winchell and Cross, to the plaintiff; for it was a condition of the putative ratification that shipment should be delayed one week, and the defendant knew that that condition was accepted by the plaintiff.

The status thus created also presented a question of fact for the jury. The evidence on this point, again, is not as clear and explicit as might be desired. But we think enough appears so that the question should have been submitted to the jury as to whether the defendant's failure to disaffirm the authority given in form by Handy, Jr., to Bartlett, on June 29, did not amount to ratification. See A. Blum, Jr.'s, Sons v. Whipple, 194 Mass. 253, 257, 80 N. E. 501, 13 A. L. R. (N. S.) 211, 120 Am. St. Rep. 553; Harrod v. McDaniels, 126 Mass. 413, 415.

A minor exception by plaintiff is to the exclusion of two letters written by Winchell to Cross on July 1, containing, inter alia, instructions as to the week's delay in shipping, pursuant to the arrangement made by Handy, Jr., and Bartlett on June 29. As we have held that there was an issue of fact as to ratification growing out of the defendant's failure seasonably to disaffirm the acts of Handy, Jr., we think these letters should have been admitted. They tend to show what was done in reliance upon the authority emanating from Handy, Jr., on June 29.

Winchell's telegram on July 18 to Bartlett, was properly excluded.

The judgment of the District Court is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion; plaintiff in error recovers costs in this court.